FRANK M. KNAPP, Appellant, *v*. UNITED STATES TRANSPORTA-
TION COMPANY, Respondent.

Fourth Department, January 9, 1918.

**Ships and shipping — negligence — liability of owner of ship for
injury to second mate caused by end of cable breaking away from
fastening to winch — expert testimony — evidence insufficient
to establish negligence — assumption of risk — maritime law
applied — Federal statute making master of ship alter ego of
owner not retroactive.**

In an action by a second mate employed by the defendant, a foreign
corporation, which owned and operated a merchant ship, to recover
damages for personal injuries caused by the end of a cable which broke
away from its fastening to a winch on the ship by reason of the alleged
negligent use of a defective appliance to secure such fastening, or failure
to inspect such appliance, it appeared that the plaintiff was familiar
with the manner in which the cable should be fastened; that expert
testimony as to the method of fastening the cable was received, but there
was no evidence that the clamp used by the defendant was insufficient
in its mechanism or strength or as to the reason for its giving way.

*Held*, on all the evidence, that the negligence of the defendant was not
established;

That the plaintiff knew how the cable was fastened and assumed the risk
of its insufficiency, if such insufficiency existed.

An action of this kind must be determined under the substantive maritime
law which may be enforced in an action in a State court where the
procedure is such as to warrant the same.

A vessel and her owner are liable to an indemnity for injuries received by
seamen in consequence of failure to supply and keep in order the proper
appliances appurtenant to the ship.

The act of Congress, passed on the 4th of March, 1915, by which it is
sought to make the master of a ship the *alter ego* of the owner, is not
retroactive.

APPEAL by the plaintiff, Frank M. Knapp, from a judgment
of the Supreme Court in favor of the defendant, entered
in the office of the clerk of the county of Erie on the 27th
day of October, 1916, upon the dismissal of the complaint by
direction of the court at the close of plaintiff's case, and also
from an order entered in said clerk's office on the same day
denying plaintiff's motion for a new trial made upon the
minutes.

*Elijah W. Holt*, for the appellant.

*Fred W. Ely* and *T. H. Gary*, for the respondent.

DE ANGELIS, J.:

The action was to recover damages for personal injuries sustained by the plaintiff as an employee of the defendant, caused by the end of a cable which broke away from its fastening to a winch by reason of the alleged negligent use of a defective appliance to secure such fastening or failure to inspect such appliance.

The defendant is a corporation of the State of Maine and owned and operated on the Great Lakes a large merchant ship known as the *B. Lyman Smith.*

On the 17th day of August, 1909, the *B. Lyman Smith* lay port side against pier No. 2 at the dock in the harbor of Lake Superior at Duluth, in the State of Minnesota. She was laden with iron ore and ready to leave the harbor.

The pier was at right angles to the shore. The ship's bow was towards the shore and her stern towards the center of the harbor.

This steamship was 380 feet long and 50 feet beam. The cable was a steel cable 275 feet long, seven-eighths of an inch in diameter and made of a center of hemp rope surrounded by six strands of steel wire. There were nineteen wires in each strand. The winch was one of two winches, side by side, called a double winch, located in the after part of the ship. We are concerned with only one of these winches. A winch resembles the ordinary spool on which thread is wound, the ends being called flanges and the part between the ends the drum. The diameter of the drum of the winch in question was fifteen inches and its length was fifteen inches. The motive power of the winch was a small steam engine. The cable was attached to the winch in this manner. The end of the cable was put through a hole in the flange of the winch from the inside near the point where the cable would begin to wind around the drum and such end of the cable was then held by a clamp on the outside of the flange. This clamp was composed of four pieces to wit: (1) The principal piece, being a piece of iron in form like the letter U with screw

threads on the two ends, (2) a straight bar of iron with holes for the reception of the two ends, and (3, 4) two nuts, one for each end. The bar of iron was adjusted to the two ends of the main piece. The end of the cable was placed between the bar and the main piece. The nuts were then adjusted to the ends and screwed down against the bar until the end of the cable was held between the bar and the main piece.

The steamship was so long that it was necessary to warp her stern around pier No. 2 to allow her bow to swing around so as to head for the lake. To accomplish this she steamed slowly backward while her stern was kept close to the pier by means of the cable and the winch. One end of the cable was attached to a spile on the far side of the pier and the other end to the winch. The captain was on the bridge and the plaintiff, the second mate, was operating the winch and was standing on the starboard side of the winch and near thereto. The captain was in command and the means of communication between him and the plaintiff were convenient and adequate. When there remained two layers of the cable upon the drum of the winch, the plaintiff called to the captain through a megaphone, "Stop her, Captain. Go ahead on her. The line is getting down short." The captain looked at him but otherwise seemed to pay no attention to what he said. The steamer was moving about as fast as a man would walk. Within a minute of the first call the plaintiff called again to the captain through the megaphone, "Captain, stop her; and go ahead on her. The line is pretty near all off the drum." There were then ten turns of the cable on the drum, that is, there was about a half a layer of the cable on the drum. Just then the winch end of the cable gave away and whipped around in such a manner as to cut off the thumb of the plaintiff's left hand and the two fingers next thereto. At the time of the accident the plaintiff stood at the winch, his left hand holding the lever which controlled the applica-tion of the power of the winch engine to operate the winch.

The plaintiff had shipped on this steamer on the second day of July, as second mate, and was leaving the harbor at Duluth upon his third trip, and during all this time he had used this winch and cable and had experienced no difficulty in connection therewith. He was thoroughly familiar with

the winch and its operation and the cable and its operation. He had the cable out pretty nearly the length of it on some occasions before the accident. He was so familiar with the manner in which the cable should be fastened to the winch that he did not hesitate to express an opinion upon the subject as an expert, in which opinion he found fault with the manner in which the cable was fastened in this case, although he was entirely familiar with the manner in which the cable was so fastened.

What became of the *clamp* is a mystery. No witness testifies to seeing it at the time of the accident or afterwards. If it slipped off the end of the cable either because the nuts on the bolts got loose, as is suggested but not proven, or because the end of the cable had worn with use or shrunk as is suggested but not proven, or if it broke as is suggested but not proven, it must have fallen and lodged in plain sight on the deck. The witness Arnold stated that he looked for the clamp, but the extent of his quest is not shown. The plaintiff discloses nothing on the subject.

Arnold, testifying naturally and not from suggestion in reference to the winch end of the cable, stated that " there were about six inches of this cable on the end that were unraveled." This end is referred to in other parts of the evidence as " frayed." There is no evidence, however, that points to anything indicating that it was worn or that it was shrunken or even drawn through the clamp. If it was " unraveled " or " frayed " for six inches that condition might have been the result of the " whipping " that is said to have taken place when the plaintiff's hand was injured.

It will be remembered that the diameter of the drum was fifteen inches and that of the cable seven-eighths of an inch. The experts called by the plaintiff testified that the diameter of the drum should be thirty times greater than that of the cable. These experts further testified that the smaller cable is more flexible and can bend around and hug the drum more than the larger cable; that the smaller cable lessens the burden upon the fastening that attaches the cable to the drum of the winch. Experts further testified that the fastening of the cable to the drum should be of such strength that if the cable was entirely unwound from the drum in the use of the

Fourth Department, January, 1918.          [Vol. 181.

winch and a test came of the relative strength of the fastening and of the cable, the cable should break before the fastening.

In order that the precise effect of the testimony given by the experts in favor of the plaintiff may be clearly shown, we shall quote some of their testimony: Mr. Williams was asked these questions and made these answers: " Q. What would you say was the approved and customary method in good engineering practice of fastening that kind of a cable, of that size [seven-eighths of an inch in diameter] to a winch of the kind shown on these exhibits, with a drum fifteen inches in diameter, in order that it might stand the normal pull or strain of such a winch? A. I would take a few strains around some interior portion, through that hole, then bring it back on itself, then use the clamp, thereby putting the strain on that portion around which the rope was wound rather than upon the clamp itself. Q. Use the clamp how, over one thickness of cable or two? A. Use the clamp around two thickness of cable, after the cable had been brought back on itself after having been wound around some portion of the machinery presumably the inside hub of that flange of the drum. That is generally accessible and clear so that the rope can be wound around it. * * * Q. Assuming that a winch of the kind shown in these photographs, with a fifteen inch diameter drum, is using a seven-eighths cable; the maximum pressure or normal load, if you call it such, which it is intended to stand, being the power of its engine, what would you say was the proper, safe, and approved method of good engineering tactics of applying that cable so as to fasten it securely to the drum? * * * A. The same method I described before exactly, by winding it around the hub of the drum, bringing it back on itself and clamping it to the other portion of the cable which throws probably ninety-five per cent of the strain on the turn around the drum and relieves the stress from the clamp.'

The witness Dollar, describing the method that might be adopted securely to fasten a cable to a winch like the one in question, stated: " One method is wrapping the bight of the cable around the hub of the winch and bringing it around a couple of spokes and bringing it back on itself and fastening it with a double clamp. Another method is to bend the

cable and catching the two parts of it in a double clamp and allowing them to draw up against the side of the flange."

The witness Farrell gives these methods: " A. There are three or four different methods; one is to twist it around the hub and then fasten it.    There is another where you pass it through a hole and back and then fasten it by a double clamp, and then put it in a bight and put the clamp over the two of them, then put on the clamp and fasten your clamps down tight."

The witness Williams, testifying in reference to the winch, cable and method of fastening in question, was asked the following question and gave the following answer: " Q. What would you say, Mr. Williams, as to whether or not there is any tendency, with a clamp of this sort shown you, upon a winch of this sort shown in these exhibits, from the operation of the winch for the clamp to become loosened? A. Well, there are two ways in which it might be done under these conditions, one would be the natural jar of the machine might loosen the nuts on the clamp, and then again the excessive pounding on the rope might tend to reduce the rope sufficiently to loosen the rope in the clamp itself without loosening the nuts in the clamp.    Those two methods might be possible, with the ultimate result the rope would not continue to clamp."

Speaking on the same subject the witness Dollar testified as follows; " A. The pull on the cable passing through the hole in the web, and being bent at almost right angles starts a working, you might say, of the fibres of the cable, the wires of the cable, which has a tendency to loosen the hold of the clamp on the cable and gradually work it off in a spiral direction, conforming to the lay of the cable."

This tendency of the nuts to loosen can be reduced or prevented according to the testimony of the experts by the use of copper bands or lock nuts in connection with the nuts that were used.

The witness Williams, after declaring that the method of fastening the cable to the winch shown in this case was insufficient, was asked the following question and gave the following answer: " Q. Assuming, Mr. Williams, that a winch exactly like the one shown on these photographs, with

Fourth Department, January, 1918.       [Vol. 181.

a fifteen inch diameter drum, using a seven-eighths cable, was being operated with about half of the throttle open, no application being made of the friction clutch, and when there were ten turns of the cable around the drum, the clamp which was of the same design, pattern and size as the one which I exhibited to you, pulled off or the cable pulled through it, so as to release the cable from the drum, what would you say was the cause, or can you tell the cause of its pulling off? A. The insufficiency of the clamp, or the arrangement by which it was attached to the rope."

The witness goes so far as to state that no system of inspection would prevent the pulling off of the cable under the assumed circumstances, although it might have a tendency in that direction.

The witness Dollar was asked these questions and made these answers: " Q. Assuming that a device like this shown on the pictures, on board the ship *B. Lyman Smith* with a [fifteen] inch diameter drum, and seven-eighths diameter cable, such as you see here exhibited, fastened with a clamp, such as you see here exhibited, while it was being operated with half or approximately half of the power of the steam applied to it [with ten turns of the cable remaining on the drum], pulled loose from the fastening so that it whipped around the drum, can you state what was the cause of its pulling loose under those circumstances?   *   *   *   A. The clamp either broke or came off of the cable.   Q. Assuming that the clamp didn't break, then what happened?   A. It came off over the end."

We assume that the last question and answer were a humorism.

Assuming for the sake of the argument that experts may go as far as they were permitted to go by the trial court, still a comparison of their testimony shows that they all agreed that the appliance used for fastening the cable to the winch should be at least as strong as the cable and that the appliance should hold with equal strength when the cable is all payed out and all that holds the cable to the drum of the winch is the appliance.   No fault is found with the mechanism or strength of the clamp.   It is suggested that the nuts might have become loosened or the cable worn or shrunken where it had been gripped by the clamp, so as to have liberated the

cable from the grip of the clamp. But there is no evidence of any such condition.

It will be observed that in their attempt to assign causes for the accident Williams attributes it to " the insufficiency of the clamp, or the arrangement by which it was attached to the rope," and Dollar says " the clamp either broke or came off of the cable."

There is no evidence that the clamp was insufficient in its mechanism or strength as already stated. There is no evidence that the nuts were loose or that the end of the cable was in such condition as to slip from the grip of the clamp. There is no evidence that the clamp either broke or did not break, although it is clear that it might have broken without fault on the part of the defendant.

So that assuming that this court was right in holding on the first appeal that the happening of the accident did not create a presumption of negligence on the part of the defendant (151 App. Div. 900), the evidence as it now stands fails to show that the defendant was negligent. The evidence goes to this, and nothing beyond, that the defendant might have been negligent.

According to all the experts, in the last analysis, the test of the fastening is that it should hold when the cable is all payed out until the cable breaks. This must be so irrespective of the size, that is, the diameter of the cable. The plaintiff knew how this cable was fastened and he assumed the risk of its insufficiency, if such insufficiency existed.

It is well settled that an action of this kind must stand or fall upon the substantive maritime law. That law may be enforced in an action in a State court where the procedure is such as to warrant the same. (*Bach* v. *Western Transit Co.*, 165 App. Div. 950; *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205; *Schuede* v. *Zenith S. S. Co.*, 216 Fed. Rep. 566; affd., 244 U. S. 646.)

The law governing the subject was comprehensively stated in the well-known case of *The Osceola* (189 U. S. 158, 175), where the court said: " Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following propositions:

" 1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

" 2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship.   (*Scarff* v. *Metcalf*, 107 N. Y. 211.)

" 3. That all the members of the crew, except perhaps the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

" 4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident."

The plaintiff sought to bring himself within the second rule laid down, but has failed.

In this connection we must not forget that the word " master " is used in the foregoing in its *nautical* sense and not as ordinarily used in treating the relation between master and servant.   An act was passed by Congress on the 4th of March, 1915 (38 U. S. Stat. at Large, 1185, chap. 153, § 20), by which it is sought to make the master of a ship the *alter ego* of the owner, but that has no application here as the plaintiff received his injuries in 1909 and that act has been held not to be retroactive.   (*Matter of Tonawanda Iron & Steel Co.*, 234 Fed. Rep. 198; *The San Juan*, 241 id. 288.)

It follows from the foregoing that the judgment and order appealed from  must be affirmed.

All concurred.

Judgment and order affirmed, with costs.